## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARY L. MCDERMOTT, | CASE NO. 1:15-cv-00984-CCC-GBC |
| Plaintiff, | (JUDGE CONNER) |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL |
| | Docs. 1, 9, 10, 13, 14, 15 |
| Defendant. | |

## REPORT AND RECOMMENDATION

### I.      Procedural Background

On September 14, 2012, Mary L. McDermott ("Plaintiff") filed as a claimant

for disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-

34, 1181-1183f, with a date last insured of December 31, 2016,[1] with a claimed

disability onset date of June 6, 2011.   (Administrative Transcript (hereinafter,

"Tr."), 21).   After the claim was denied at the initial level of administrative review,

the Administrative Law Judge (ALJ) held a hearing on November 19, 2013.   (Tr.

---

[1] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. 42 U.S.C. §§ 415(a) and 416(i)(1). The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." *See* 42 U.S.C. § 416(i)(2); *accord Renfer v. Colvin*, No. 3:14CV611, 2015 WL 2344959, at *1 (M.D. Pa. May 14, 2015).

59-86).   On December 19, 2013, the ALJ found that Plaintiff was not disabled within the meaning of the Act.   (Tr. 18-34).   Plaintiff sought review of the unfavorable decision, which the Appeals Council denied on March 24, 2015, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-4).

On May 20, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration ("SSA") denying social security benefits. (Doc. 1).   On August 13, 2015, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings. (Doc. 10, 11).   On October 8, 2015, Plaintiff filed a brief in support of the appeal.   (Doc. 16 ("Pl. Brief")).   On November 4, 2015, Defendant filed a brief in response.   (Doc. 17 ("Def. Brief")).   On November 30, 2015, Plaintiff filed a reply brief.   (Tr. 20 ("Reply")).   On January 12, 2016, the Court referred this case to the undersigned Magistrate Judge.

## II.     Relevant Facts in the Record
### A. Education, Age, and Vocational History

Plaintiff was born in August 1977 and was classified by the Regulations as a younger individual through the date of the ALJ decision.   (Tr. 29); 20 C.F.R. § 404.1563.   The highest grade Plaintiff completed was the tenth grade and she did

not obtain a GED.  (Tr. 64).  Plaintiff's past relevant work included work as a

nurse's aide.  (Tr. 81).  Earnings reports demonstrate that Plaintiff had earned four

quarters of coverage[2] from 1997 to 2011.  (Tr. 127-131).  Plaintiff testified that she

had not applied to any jobs since her automobile accident on June 6, 2011 (Tr. 64)

(Tr. 93, 239, 351, 421-36 (regarding her automobile accident)).  Plaintiff testified

that she obtained a settlement of $17,500 due to the motor-vehicle accident.  (Tr.

65).  Plaintiff testified that when she was fired, her employer advised her to apply

for unemployment benefits.   (Tr. 79).   Plaintiff testified that she received

unemployment benefits from September 2011 to December 2012.   (Tr. 79).

Plaintiff testified that she currently treats her pain with ibuprofen due to the lack of

insurance.  (Tr. 65).

## B. Relevant Treatment History and Medical Opinions

### 1.    Agency Consultative Non-Examining Opinion: Mark Bohn, M.D.

On January 7, 2013, Dr. Bohn reviewed Plaintiff's medical records and

rendered a physical residual functional capacity assessment.  (Tr. 88-95).  Dr.

Bohn reviewed: 1) consultative examination reports from the Intermountain

---

[2] In a claimant's earnings record, a "c" indicates that a claimant has earned enough to qualify for a quarter of coverage and an "n" indicates that the threshold amount was not earned in a given year.  *See* "Understanding an earnings record," 1 Soc. Sec. Disab. Claims Prac. & Proc. § 5:21 (2nd ed.).  For example, in 2000, "cccc" would indicate that a claimant has earned at least $780 each quarter of 2000 and "cccn" would indicate that a claimant earned at least $780 for the first three quarters of 2000.  *See Weidman v. Colvin*, No. CV 3:14-552, 2015 WL 5829788, at *11 n. 4 (M.D. Pa. Sept. 30, 2015).

Medical Group; 2) records from Geisinger Wyoming Valley Medical Center; 3) records from Kevin J. Carey; 4) records from Adult Services Unlimited, and; 5) records from Dr. Vithalbhai Dhaduk.  (Tr. 88-89).  Dr. Bohn opined that Plaintiff could: 1) frequently lift and/or carry ten pounds, stand and/or walk a total of two hours, sit a total of six hours in an eight-hour workday, and no limitations in the ability to push and pull other than those indicated for lifting and carrying.  (Tr. 91-92).  Dr. Bohn opined that due to Plaintiff's degenerative disc disease and obesity, he could occasionally climb ramps/stairs, balance, stoop (bend at the waist), kneel, crouch, and crawl, but could never climb ladders ropes.  (Tr. 91-92).  Dr. Bohn opined that Plaintiff did not have any limitations in manipulation, vision, or communication.  (Tr. 92).  Dr. Bohn opined that Plaintiff was capable of performing sedentary work.  (Tr. 91-93).

In explanation for his findings, Dr. Bohn noted that Plaintiff was in a motor vehicle accident on June 6, 2011, that Plaintiff's Activities of Daily Living (ADLs) were limited by back pain and Plaintiff could do light chores and could drive.  (Tr. 93).  Dr. Bohn noted records indicating that Plaintiff's BMI was 39, that an MRI and EMG studies of Plaintiff lumbosacral spine revealed degenerative disc disease and that Plaintiff's head, ears, eyes, nose, throat,[3] lungs, heart, blood pressure, and abdomen were "good."  (Tr. 93).  Dr. Bohn noted records indicating that Plaintiff's

---

[3] "HEENT" stands for "head, eyes, ears, nose, and throat."   Neil M. Davis, *Medical Abbreviations*, at 155 (14th ed. 2009).

cervical spine was tender with slightly decreased range of motion, lumbosacral spine was tender with a decreased range of motion, positive straight leg raise test ("SLR"), and that Plaintiff demonstrated a gait and limp.  (Tr. 93).  Dr. Bohn also reviewed Dr. Anselmi's[4] consultative evaluation and opined that Dr. Anselmi's opinion (Tr. 404-05) was "a snapshot" and an "overestimat[ion] of severity" of Plaintiff's limitations.  (Tr. 93-94).

### 2.   Intermountain Medical Group: Dustin Hobbs, P.A.C.; Kevin Carey, D.O.[5]

On May 23, 2011, Plaintiff sought treatment for knee pain after falling.  (Tr. 355-57).  On June 9, 2011, three days following a motor-vehicle accident, Plaintiff sought follow-up treatment with her primary care provider.  (Tr. 351).  Mr. Hobbs noted that Plaintiff was functional in activities of daily living, her lower back exhibited muscle spasms and tenderness on palpation of the left side, cervical spine showed abnormalities, trapezius muscle was tender upon palpation, SLR was positive on the right, and she exhibited pain with ambulation  (Tr. 352-53).

On June 23, 2011, Plaintiff sought treatment for knee and back pain.  (Tr. 343-49).  Mr. Hobbs noted that Plaintiff was functional in activities of daily living, had tenderness upon palpation in the lower left of the back, the knees showed

---

[4] Although Dr. Bohn initially wrote "Dr. Anselone," he later states that for reconciling opinions, he reviewed the December 2012 non-treating opinion of Dr. Anselmi.  (Tr. 93).

[5] Although Dr. Carey did not provide direct examination or treatment, he signed the reports created by the physician assistant, Mr. Hobbs.  Pl. Brief at 7 n.1.  Dr. Carey's office also had the medical reports from Dr. Dhaduk and physical therapy reports from Riverside Rehabilitation.  (Tr. 358-83).

abnormalities and Plaintiff expressed pain with motion from the knee.  (Tr. 349).

Mr. Hobbs concluded that Plaintiff had osteoarthritis of the knee.  (Tr. 349).

On July 7, 2011, Mr. Hobbs noted that Plaintiff was functional in activities

of daily living and had a positive SLR on the left.  (Tr. 340-41).  On July 7, 2011,

Mr. Hobbs completed an assessment of Plaintiff's capabilities even though she was

still recovering from her motor vehicle accident from the previous month (he

opined she had not reached maximum medical improvement) and opined that

Plaintiff could: 1) sit three to five hours; 2) stand and or walk one to three hours; 3)

never bend, push, pull, twist, climb, balance, stoop, kneel, crouch, crawl, or reach;

4) could perform simple grasping and fine manipulation bilaterally; and, 5) could

operate a motor vehicle.  (Tr. 443).  Mr. Hobbs also responded to an insurance

document that Plaintiff was disabled from June 9, 2011, through July 7, 2011, due

to back pain, weakness, and difficulty standing for more than an hour.  (Tr. 441).

Mr. Hobbs opined that Plaintiff could return to work on modified duty.  (Tr. 441).

On July 12, 20122, Dr. Naresh Shah interpreted Plaintiff's MRI noting that it

revealed:

> slight loss of signal of the disc at L5-S1 indicating minimal to mild
> disc degeneration. There is minimal disc bulging at that level. The rest
> of the examination appears essentially normal and the rest of the
> intervertebral discs appear essentially normal. No additional evidence
> of disc herniation or spinal stenosis. The conus medullaris
> unremarkable. Cauda equine unremarkable. Vertebral bodies reveal
> no evidence of compression fracture. No evidence of metastatic or
> destructive process.

(Tr. 338).  Dr. Shah concluded that there was "[n]o significant abnormality other than minimal disc bulging at L5-S1." (Tr. 338).

On July 21, 2011, Mr. Hobbs noted that Plaintiff reported no radicular pain, was functional in activities of daily living, and her lower back exhibited tenderness on palpation and exhibited spasms on the left. (Tr. 334-36).  Mr. Hobbs also noted that Plaintiff's SLR was positive on the left and negative on the right.  (Tr. 336). On July 21, Mr. Hobbs filled out a prescription note stating that Plaintiff would be able to return to work August 18, 2011.  (Tr. 445).

On August 18, 2011, Mr. Hobbs noted that Plaintiff was functional in activities of daily living and her lower back exhibited tenderness on palpation of the left paraspinal region.  (Tr. 331-32).  Plaintiff reported that she could not return to work light duty, and Mr. Hobbs opined that based on her examinations, she would be able to return to full duty after review of physical therapy and the next office visit.  (Tr. 333).  Mr. Hobbs filled out a prescription note stating that Plaintiff would be unable to return to work until September 16, 2011.  (Tr. 444).

On September 21, 2011, Mr. Hobbs noted that Plaintiff was functional in activities of daily living and her lower back exhibited tenderness on palpation of the left paraspinal region.  (Tr. 327-28).  Mr. Hobbs noted that Plaintiff's sensory and motor strength were normal.  (Tr. 328).  On October 21, 2011, Mr. Hobbs noted that Plaintiff was functional with activities of daily living.  (Tr. 323).  Mr.

Hobbs also noted tenderness on palpation of the left paraspinal region and that Plaintiff's gait and stance was abnormal. (Tr. 324).

On September 21, 2011, Mr. Hobbs opined that Plaintiff could perform light duty work which did not require any lifting or bending and responded that he was unsure whether Plaintiff would have any permanent restriction of her physical capabilities. (Tr. 449-450). On November 21, 2011, Mr. Hobbs noted that Plaintiff was functional with activities of daily living, and noted tenderness on palpation of the back, no sensory abnormalities, and normal strength. (Tr. 319-20).

On December 21, 2011, Mr. Hobbs noted that Plaintiff was functional with activities of daily living, demonstrated lower back tenderness on palpation of the left paraspinal region, no sensory exam abnormalities, and that strength was reduced for bending and squatting. (Tr. 315-16)

### 3.    Riverside Rehabilitation

Plaintiff underwent physical therapy July 2011 to December 2011, during which time she improved in her level of functioning and movement. (Tr. 172-88). On December 12, 2011, she was discharged for obtaining the maximum level of improvement possible. (Tr. 266). Plaintiff met the goal of being independent in turning and scooting in bed. (Tr. 266). While here initial level of pain was "moderate-severe," upon discharge, it was "mild-moderate" with limitation during and or after a specific activity of daily living. (Tr. 266). The discharge summary

listed that Plaintiff met the following goals: 1) reduction in pain by one to two levels; 2) manual muscle test improved by 1/3 grade; 3) range of motion increased by five to ten degrees; and, 4) ability to perform ADLs improved.  (Tr. 267).  However, the discharge summary listed that Plaintiff did not met the following long-term goals: 1) improvement of work performance related activities; 2) manual muscle test to equal 5/5; and, 3) improvement in ability to engage in recreational activities.  (Tr. 267).

### 4.     Intermountain Medical Group Consultative Examination: Lanning Anselmi, M.D.[6]

On December 12, 2012, Dr. Anselmi evaluated Plaintiff and rendered an opinion regarding her work-related limitations.  (Tr. 401-07, 417-19).  As with other examinations with Mr. Hobbs through the Intermountain Medical Group, Dr. Anselmi noted that Plaintiff was functional in her activities of daily living.  (Tr. 418).  Dr. Anselmi noted that Plaintiff was ambulatory, although she exhibited "a degree of unsteadiness when she ambulate[d]."  (Tr. 401).  Plaintiff reported that she had been involved in a motor vehicle accident in June 2011 and sustained multiple injuries and since that time, she has had severe pain in her lower back

---

[6] Plaintiff points out that at the time of the consultative evaluation, Dr. Anselmi was a member of the same practice group where she sought treatment from Mr. Hobbs who was working under the supervision of Dr. Carey.  However, Dr. Anselmi saw Plaintiff in an office in a different city than that of Mr. Hobbs.  Pl. Brief at 12.  Plaintiff states that "[t]he InterMountain Medical Group records are all noted as bing [sic] electronically signed so it is likely that Dr. Anselmi had access to the plaintiff's records. He mentions reviewing records in his report."  Pl. Brief at 12.

area.  (Tr. 401).  Plaintiff reported that despite attempts of rehabilitation, her pain has not improved and she continues to experience lower back pain.  (Tr. 401).

Dr. Anselmi noted that Plaintiff's medical records reveal that Plaintiff has L5 and S1 radiculopathy with severe spasm in the paraspinal muscles and bulging disc at the L5-S1 level.  (Tr. 401-02).  Dr. Anselmi noted that Plaintiff is also bothered by a flexion extension injury of her cervical spine, and she has a problem with marked obesity.  (Tr. 402).  Plaintiff reported that at the time of the evaluation, she was not on any regular medicines besides Lyrica[7] and a periodic anti-inflammatory medicine for her discomfort.  (Tr. 402).

Upon examination, Dr. Anselmi observed that Plaintiff had a full range or near-full-range of motion in the shoulders, elbows, wrists, cervical spine, and ankles.  (Tr. 406-07).  Dr. Anselmi observed that Plaintiff had a flexion-extension of 100 degrees out of 150 degrees in the bilateral knees, forward flexion of 70 degrees out of 100 degrees in the bilateral hips, interior rotation of 30 degrees out of 40 degrees for the bilateral hips, external rotation of 40 degrees out of 50 degrees for the bilateral hips, backwards extension of 20 degrees out of 30 degrees for the bilateral hips, abduction of 30 degrees out of 40 degrees for the bilateral hips,  adduction of 15 degrees out of 20 degrees for the bilateral hips, had a

---

[7] Lyrica is used to treat neuropathic pain associated with spinal cord injury.  See FDA Label Approval History, NDA 021446, March 9, 2016, http://www.accessdata.fda.gov/drugsatfda_docs/label/2016/021446s030,022488s010lbl.pdf (last accessed October 24, 2016).

flexion-extension of 70 degrees out of 90 degrees in the lumbar spine, and bilateral lumbar flexion of 15 degrees out of 20 degrees.  (Tr. 406-07).

Dr. Anselmi observed "some paraspinal tenderness with decreased range of motion" in Plaintiff's neck and bilateral tenderness over the lumbosacral musculature.  (Tr. 402).  Dr. Anselmi observed that Plaintiff had "a weakly positive left leg straight raising at 35 degrees and at 40 degrees in the right leg. DTRs were found to be equal and bilateral. Babinski sign was negative."  (Tr. 402).  Dr. Anselmi concluded that Plaintiff had a chronic lumbar radiculopathy at the L5- S1 levels, chronic cervical and lumbar myofascial  syndrome, and a marked problem with obesity.  (Tr. 402-03).  In an accompanying form, Dr. Anselmi checked boxes indicated that Plaintiff could frequently lift and carry up to ten pounds, occasionally carry twenty pounds, stand and walk an hour or less in an eight-hour day (adding written explanation that such was due to pain with prolonged standing), and sit one to two hours.  (Tr. 404).  Dr. Anselmi also indicated that Plaintiff had limitations to push and pull in the lower extremities due to pain, could occasionally bend and balance, and could never kneel, stoop, crouch, or climb.  (Tr. 404-05).  Dr. Anselmi also opined that Plaintiff had no limitations in manipulation and no environmental restrictions.  (Tr. 405).

### 5.      Professional Neurological Associates, P.C.: Vithalbhai D. Dhaduk, M.D.[8]

On December 14, 2011, Dr. Dhaduk noted that Plaintiff was involved in a motor vehicle accident in June 2011, during which she injured her neck and lower back.  (Tr. 289).   According to Plaintiff, the next morning, she woke up with severe stiffness and pain in her neck and back and sought emergency treatment at Geisinger. (Tr. 289).   A few days later, Plaintiff pursued physical therapy at Riverside by Dr. Kevin Carey and was still going as of December 2011.  (Tr. 289). Plaintiff reported that her neck felt better, however, she still had lower back pain which radiated to the lower extremities, more on the left than right with tingling, numbness and stiffness.  (Tr. 289).  Plaintiff reported that she wakes up at night with spasms.  (Tr. 289).  Dr. Dhaduk reviewed an MRI of the lumbosacral spine which showed a small bulging disc at L5-S1 level and no large disk herniation. (Tr. 289-90).  Plaintiff reported that she felt as though her left leg was going to give out.  (Tr. 289).

On examination of her motor system, Dr. Dhaduk observed, "diffuse severe tenderness" in the cervical and lumbosacral regions with paraspinal muscle spasms.  (Tr. 290).  Dr. Dhaduk observed that Plaintiff's cervical and lumbosacral

---

[8] Notice was given that on July 21, 2013, a building fire destroyed all of the patient medical records.  (Tr. 420).  Plaintiff points out that "[t]he notice has a fax transmittal imprint at the bottom of the page of October 24, 2013, slightly less [than one month] before the hearing before the ALJ."  Pl. Brief at 11.

spine movements were restricted in lateral movement, as well as, flexion/extension and she had muscle guarding in the upper and lower extremities.  (Tr. 290). During the examination, Plaintiff's SLR was positive at 30 degrees on the left and 40 degrees on the right.  (Tr. 290).  Dr. Dhaduk noted no focal weakness, no pronator drift, no hemiparesis, no muscle wasting, and no fasciculations.  (Tr. 290).

Dr. Dhaduk also observed that Plaintiff's deep tendon reflexes were mildly diminished at the ankles and her Babinski's sign was negative.  (Tr. 290).  Dr. Dhaduk also noted that Plaintiff had a diminished response to touch and pain in the C5, C6, L5, and S1 root distribution bilaterally and proprioceptor sensations were intact.  (Tr. 290).   Dr. Dhaduk also observed that Plaintiff's gait was mildly antalgic and she limped on the left side.  (Tr. 290).   Dr. Dhaduk concluded that Plaintiff had "acute severe lumbago with L5 and S1 radiculopathy bilaterally with paraspinal muscle spasms, left more than right," small bulging disc at L5-S1 level, and acute severe cervical sprain syndrome with cervical radiculopathy.  (Tr. 291). Dr. Dhaduk recommended that Plaintiff: 1) discontinue physical therapy; 2) do cervical and lumbar exercises; 3) treat with moist heat; 4) frequently change her position; 5) take 50 mg of Lyrica, and; 6) if she could, find light duty work.  (Tr. 291).

On December 30, 2011, Plaintiff reported experiencing lumbar pain as well as tingling and numbness radiating into the legs and feet bilaterally.  (Tr. 294).

Plaintiff reported that she was taking Ultram[9] and although she was prescribed Lyrica, she had not started taking Lyrica.  (Tr. 292).  Dr. Dhaduk noted that EMG/NCV studies from that day showed mild acute L5 and S1 radiculopathy with paraspinal muscle spasms and signs and symptoms suggestive of lumbago" and she had "been released to light duty work."  (Tr. 292, 294).  Dr. Dhaduk observed: 1) diffused severe tenderness in the cervical and lumbosacral regions with paraspinal muscle spasms; 2) cervical and lumbosacral spine movements were restricted in lateral movement, as well as, flexion/extension; 3) muscle guarding in the upper and lower extremities; 4) positive SLR at 30 degrees on the left and 40 degrees on the right; 5) deep tendon reflexes were minimally diminished at the ankles; 6) negative Babinski's sign; 7) diminished response to touch and pain in the C5, C6, L5, and S1 root distribution bilaterally; 8) mildly antalgic gait where Plaintiff limps on the left, and; 9) no ataxia.  (Tr. 292, 294).  Dr. Dhaduk's conclusions and recommendations remained the same as those made in the previous visit.  (Tr. 293).

On January 20, 2012, Plaintiff sought follow-up treatment.  (Tr. 296-97). Dr. Dhaduk noted that Plaintiff was still using Ultram and started on Lyrica which she had been tolerating well.  (Tr. 296).  Dr. Dhaduk noted that Plaintiff was

---

[9] Ultram is tramadol hydrochloride and is a synthetic opioid analgesic.  See FDA Label Approval History,         NDA         020281,         September         9,         2009, http://www.accessdata.fda.gov/drugsatfda_docs/label/2009/020281s032s033lbl.pdf         (last accessed October 24, 2016).

"doing a little better" and had been released to light duty work.  (Tr. 296).  Dr. Dhaduk made identical observations as with the last visit.  *Compare* (Tr. 292) *with* (Tr. 296).  Dr. Dhaduk's conclusions remained the same as those made in the previous visits.  (Tr. 297 (same as Tr. 291, 293).  Dr. Dhaduk recommended that Plaintiff: 1) do cervical and lumbar exercises; 2) treat with moist heat; 3) frequently change her position; 4) take 50 mg of Lyrica, and; 5) light to medium duty work.  (Tr. 297).

On February 24, 2012, Plaintiff sought follow-up treatment.  (Tr. 298-99).  Dr. Dhaduk noted that Plaintiff was "doing fair, but still ha[d] bad days," and was tolerating Lyrica fairly well.  (Tr. 298).  Dr. Dhaduk made identical observations as with the last visit.  *Compare* (Tr. 298) *with* (Tr. 292) *and* (Tr. 296).  Dr. Dhaduk's conclusions and recommendations remained the same as those made in the previous visit.  (Tr. 296, 297, 299).

On April 9, 2012, Plaintiff sought follow-up treatment.  (Tr. 300-01).  Dr. Dhaduk noted that Plaintiff's lower back pain was "quite severe and radiates to the lower extremities," and that she had good and bad days.  (Tr. 300). Plaintiff reported that she was taking Lyrica but that it was not helping much.  (Tr. 300).  Dr. Dhaduk made identical observations as with the last visit.  *Compare* (Tr. 300) *with* (Tr. 292, 296, 298).  Dr. Dhaduk's conclusions remained the same as those made in the previous visit.  (Tr. 297, 299, 301).  In addition to the previously

repeated recommendations, Dr. Dhaduk recommended that Plaintiff increase the Lyrica dosage to 75 mg and that she could do medium duty work. (Tr. 301).

In a letter to Plaintiff's attorney dated February 29, 2012, Dr. Dhaduk stated that Plaintiff had been treated with physical therapy, anti-inflammatory medications, and pain medications. (Tr. 545). Dr. Dhaduk stated that Plaintiff had been released to light-medium duty work and that her prognosis for complete recovery is poor. (Tr. 545).

On April 25, 2012, Plaintiff received a bilateral L5 and S1 facet joint nerve block. (Tr. 302). Dr. Dhaduk made identical observations as with the last visit. *Compare* (Tr. 302) *with* (Tr. 292, 296, 298, 300). Prior to the joint nerve block procedure, Plaintiff reported experiencing pain at of level of eight out of nine and after the procedure, Plaintiff reported experiencing a level of pain of three out of ten. (Tr. 303).

### III.   Legal Standards and Plaintiff's Alleged Errors

To receive benefits under the Act, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The ALJ uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520. The ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520. Before step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that the claimant can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability under the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

With due deference to the Commissioner's interpretation of social security rulings and regulations, the court may reverse the Commissioner's final determination if the ALJ did not properly apply the legal standards. *See* 42 U.S.C. § 405(g) ("court shall review only the question of conformity with such regulations and the validity of such regulations"); *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166-67 (2012) (deference to agency interpretation of its own regulations); *Sanfilippo v. Barnhart*, 325 F.3d 391, 393 (3d Cir. 2003) (plenary review of legal questions in social security cases); *see also Witkowski v. Colvin*, 999 F. Supp. 2d 764, 772-73 (M.D. Pa. 2014) (citing *Poulos v. Commissioner of Social Security*, 474 F.3d 88, 91 (3d Cir. 2007)). The court may also reverse the Commissioner if substantial evidence does not support the ALJ's decision. *See* 42 U.S.C. § 405(g); *see also Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir.1986). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "less than a preponderance" and "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health &*

*Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## A.     Obesity

Plaintiff contends that the ALJ erred by "failing to explain how he evaluated [Plaintiff's] obesity under the terms of SSR 02-01 p."  Pl. Brief at 20, 30-32. Plaintiff asserts that the ALJ's discussion of Plaintiff's obesity was insufficient, prevents the Court from meaningful review, and is inadequate to meet the requirements of formulating an RFC and at steps 4 and 5.  Pl. Brief at 32.  At step two, the ALJ found that Plaintiff's obesity was a severe impairment.  (Tr. 23).  The ALJ found:

> [Plaintiff's] obesity is evaluated under multiple listings. As indicated by Social Security Ruling 02-01 p, obesity may have an adverse impact upon co-existing impairments. Thus, this condition does warrant consideration in conjunction with any related musculoskeletal, respiratory or cardiovascular conditions. These considerations have been taken into account not only in determining whether the claimant has an impairment that is severe, but also in reaching all conclusions herein. After evaluating any additional and cumulative effects of [Plaintiff's] obesity, the evidence does not support a finding that he meets or equals the criteria of a listing.

(Tr. 24).  The ALJ acknowledged Dr. Anselmi's opinion which noted that Plaintiff had a problem with marked obesity.  (Tr. 28).  The ALJ noted that Plaintiff's height and weight on November 19, 2013, indicated that she was obese.  (Tr. 29). The ALJ noted that Plaintiff testified that she weighed 245 pounds, and that she

had difficulty standing and walking. (Tr. 26). The ALJ also noted Plaintiff's weight in the medical records. (Tr. 26-28).

Although obesity is recognized as "a medically determinable impairment that is often associated with disturbance of the musculoskeletal system ... [which] can be a major cause of disability . . . " and must be considered in making a residual functional capacity determination, 20 C.F.R. § 404, subpt. P, app. 1, 1.00(Q), it is not itself a listed disability.[10] "Obesity in combination with another impairment *may or may* not increase the severity or functional limitations of the other impairment." SSR 02-1p (emphasis added).

Here, although the ALJ expressly found that Plaintiff's obesity constituted a "severe" impairment, Plaintiff did not rely on her obesity to establish the existence of functional limitations in her application for disability benefits. (Tr. 135) (application listing several physical conditions alleged to limit ability to work, and does not include obesity). Moreover, there is little in the record to demonstrate that Plaintiff's alleged limitations are due to or exacerbated by obesity. Plaintiff does not direct the court to any medical records where a doctor indicated that Plaintiff's obesity was contributing to her alleged disabling limitations in a manner that is not supported in the RFC.

---

[10] 64 F.R. 46122–01 (1999) (deleting Listing 9.09, "Obesity" from the "Listing of Impairments" in 20 C.F.R. subpt. P, app. 1).

Although Plaintiff's primary care provider noted that Plaintiff was obese, there was no indication that such was a medical concern.  (312, 315-16, 319-20, 323, 327-28, 331-33, 335-36, 340-41, 344, 348, 418).  Plaintiff does not direct to Court to any evidence in the record in support of the contention that any of Plaintiff's functional limitations were due to or exacerbated by obesity to the extent that is not already reflected in the RFC.  "[W]e will not make assumptions about the severity or functional effects of obesity combined with other impairments."  SSR 02-1p.  To the extent that obesity did impact Plaintiff's health, the ALJ noted the records and opinions which mentioned Plaintiff's obesity.  (Tr. 28-29) (Dr. Anselmi's opinion mentioned obesity at Tr. 402 without any discussion regarding whether it impacted Plaintiff's limitations).  In fact, the only opinion which directly addressed the etiology of Plaintiff's limitations as related to obesity was that of Dr. Bohn, and the ALJ gave great weight to Dr. Bohn's opinion.  (Tr. 28) (Dr. Bohn's opinion (Tr. 91-92)).  The Court finds no error.

Even assuming *arguendo* that the ALJ erred, the Court would still find harmless error as the omission does not affect the outcome of the case.  *See Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).  Ultimately, the outcome of the case depends on the demonstration of the functional limitations of the disease or impairment rather than the mere diagnosis of the disease or name of the impairment.  *See Alexander v. Shalala*, 927 F. Supp. 785, 792 (D.N.J. 1995)

*aff'd sub nom. Alexander v. Comm'r of Soc. Sec.*, 85 F.3d 611 (3d Cir. 1996); *accord*, *Walker v. Barnhart*, 172 F. App'x 423, 426 (3d Cir. 2006). The ALJ's failure to explicitly delineate where obesity may have caused or contributed to specific symptoms and functional limitations does not undermine the entire analysis, when ultimately the ALJ properly characterized the symptoms and functional limitations. *See Alexander v. Shalala*, 927 F. Supp. 785, 792 (D.N.J. 1995) *aff'd sub nom. Alexander v. Comm'r of Soc. Sec.*, 85 F.3d 611 (3d Cir. 1996); *accord*, *Walker v. Barnhart*, 172 F. App'x 423, 426 (3d Cir. 2006); *see also Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1165 (10th Cir. 2012) (finding that where the ALJ's limitations in the residual functional capacity (RFC) were not inconsistent with the conclusions of the omitted examiner opinion, the ALJ's failure to specifically weight examiner's opinion was harmless); *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) (finding that a "function-by-function" analysis for medical conditions was unnecessary where the ALJ took into account those limitations for which there was record support that did not depend on the plaintiff's subjective complaints).

The Court notes that the ALJ's opinion considered all impairments of record and detailed the limitations resulting from the impairments at subsequent steps. The ALJ noted Plaintiff's history of obesity and the ALJ's determination of Plaintiff's RFC acknowledged Plaintiff's symptoms and functional impairments

that were reflected in the record.  (Tr. 23-29).  The ALJ noted the opinion evidence, Plaintiff's physical symptoms and the impact of those symptoms on Plaintiff's functional capacity.  (Tr. 23-29).

Based on the forgoing, the ALJ did not err by omitting a discussion of SSR 02-lp or not including specific findings of the impact Plaintiff's obesity had on her RFC or on Plaintiff's other impairments.

## A. Credibility

Plaintiff argues that the ALJ failed to properly evaluate Plaintiff's credibility "by assuming, that her receipt of unemployment benefits during a period of disability rendered her less credible without giving consideration to agency policy on this issue."  Pl. Brief at 20, 32-37.  Plaintiff also argues that the ALJ erred in providing insufficient discussion of the Plaintiff's loss of insurance, "only noting that she has not gone to the emergency room due to her pain."  Pl. Brief at 36-37, (Tr. 29).

Where a medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a credibility finding on the claimant's subjective statements. SSR 96-7p.  The credibility finding must be based on a consideration of the entire case record, considering several factors in totality.   SSR 96-7p; 20 C.F.R. §§

404.1529, 416.929; *accord Weidman v. Colvin*, No. 3:14-CV-0552-MEM-GBC,

2015 WL 6673830, at \*24-33 (M.D. Pa. Aug. 7, 2015) *report and recommendation*

*adopted*, No. CV 3:14-552, 2015 WL 5829788 (M.D. Pa. Sept. 30, 2015).  There is

a distinction between what an adjudicator must "consider" and what the

adjudicator must explain in the disability determination.  *See* SSR 06-03p

(explaining that to "consider" means to provide explanation sufficient for a

"subsequent reviewer to follow the adjudicator's reasoning"); *Phillips v. Barnhart*,

91 F. App'x 775, 780 n. 7 (3d Cir. 2004); *Francis v. Comm'r Soc. Sec. Admin.*, 414

F. App'x 802, 804 (6th Cir. 2011) (social security regulations enumerating factors

of an ALJ to consider "require only that the ALJ's decision include 'good reasons'

. . . not an exhaustive factor-by-factor analysis").

Plaintiff does not address the opinion evidence and medical evidence that

supports the ALJ's decision.  Contrary to Plaintiff's argument suggesting that the

ALJ rejected Plaintiff's credibility solely on the basis of her receipt of

unemployment benefits, the ALJ looked at several factors in totality which

comports with the "agency policy on this issue" that Plaintiff cites as support.  Pl.

Brief at 39-42 ("Appendix").

Substantial evidence supports the ALJ's credibility determination.  The ALJ

found that "[o]verall, the record simply does not support [Plaintiff's] alleged level

of incapacity" and that Plaintiff's "longitudinal medical history is not consistent

with her allegation of disability. . . ." (Tr. 25). The ALJ relied on medical opinions, medical, and non-medical evidence in totality which was inconsistent with Plaintiff's allegation of debilitating limitations. (Tr. 25-28). The ALJ pointed out records noting: 1) no deformity, some tenderness, muscle spasm, full range of motion in all extremities, cervical spine showing no abnormalities, and full motor strength; 2) that Plaintiff did not appear to be in any acute distress; 3) a positive straight leg raise on the right during emergency room treatment, then on the left in subsequent evaluations; 4) MRI from July 2011 showing no significant abnormality other than minimal disc bulging; 5) physical therapy notes indicated that Plaintiff made progress towards her goals; 6) notwithstanding the observation that she had a mildly antalgic gait, Dr. Dhaduk still opined that Plaintiff could still do light to medium duty work; 7) Medical records from February and April 2012 noted that Plaintiff could do medium duty work; and 8) Dr. Bohn's opinion that Plaintiff was capable of doing sedentary work. (Tr. 26-28). It was reasonable for the ALJ to rely on medical opinions where the treating physician, Dr. Dhaduk and the agency consultative reviewer concluded that Plaintiff was still capable of work contrary to the degree of alleged disabling impairments. The ALJ's observation regarding Plaintiffs receipt of unemployment benefits was simply a part of the totality analysis.

Plaintiff testified that when she was fired, her employer advised her to apply for unemployment benefits. (Tr. 79). Plaintiff testified that she received unemployment benefits from September 2011 to December 2012. (Tr. 79). Plaintiff testified that she had not applied to any jobs since her June 2011 automobile accident. (Tr. 64).[11]

Receipt of unemployment, although not determinative alone, may be considered by the ALJ. *See Myers v. Barnhart*, 57 F. App'x 990, 997 (3d Cir. 2003) (It is "entirely proper for the ALJ to consider that [Plaintiff's] receipt of unemployment benefits was inconsistent with a claim of disability during the same period"); *Burnside v. Colvin*, No. 3:13-CV-2554, 2015 WL 268791, at *17 (M.D. Pa. Jan. 21, 2015) (discussing authority from different circuits).

The ALJ discussed the material evidence throughout his decision and based on the foregoing, substantial evidence supports the ALJ's credibility determination. *See* SSR 96-7p; 20 C.F.R. §§ 404.1529, 416.929.

## B. Weight Accorded to Medical Opinions

Plaintiff argues that the ALJ erred "in making use of [Dr. Dhaduk's] language regarding [Plaintiff] being cleared to do ''medium" work when the ALJ

---

[11] The Court notes that an individual is ineligible for compensation for any week "'[i]n which his unemployment is due to failure, without good cause . . . to apply for suitable work at such time and in such manner as the department may prescribe . . . .'" *Murphy Marine Servs., Inc. v. Unemployment Comp. Bd. of Review*, No. 2232 C.D. 2013, 2014 WL 3812329, at *3 (Pa. Comm. Ct. Aug. 4, 2014). It would appear that Plaintiff's not applying for jobs would be inconsistent with the requirements to receive unemployment benefits.

did not have any basis to understand what the doctor meant by 'medium.'"   Pl. Brief at 19.   Plaintiff further contends since Dr. Dhaduk's opinion that Plaintiff was cleared to do "medium" work was made prior to administering spinal nerve blocks, it can be inferred that Plaintiff's condition deteriorated after the "medium work" opinion and the subsequent treatment negates Dr. Dhaduk's opinion that Plaintiff was capable of medium work.   *See* Pl. Brief at 19.   Plaintiff also argues that the ALJ erred in allocating greater weight to the non-examining January 2013 opinion of Dr. Bohn over the December 2012 consultative examining opinion of Dr. Anselmi.  Pl. Brief at 19, 25-30.

For weighing all medical opinions, the Commissioner considers the factors enumerated in 20 C.F.R. §§ 404.1527(c), 416.927(c).   Pursuant to subsection (c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion" and "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion."  Pursuant to subsection (c)(4), "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."   Pursuant to subsection (c)(5), more weight may be assigned to specialists, and subsection (c)(6) allows consideration of other factors which "tend to support or contradict the opinion."   20 C.F.R. §§ 404.1527(c), 416.927(c).

Generally, there is a hierarchy of weight allotted between three types of physician opinions: opinions of those who treat the claimant (treating physicians) are given more weight than opinions by those who examine but do not treat the claimant (examining physicians), and the opinions of examining physicians are given greater weight than the opinions of those who neither examine nor treat the claimant (non-examining physicians).   *See* 20 C.F.R. §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2).   However, this hierarchy is not absolute.   *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *see e.g.*, *Johnson v. Barnhart*, 89 F. App'x 364, 368 (3d Cir. 2004) (affirming rejection of examining physician opinion in favor of opinion of non-examining physician); *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000) (noting criteria necessary to reject a treating physician's opinion); *Morris v. Barnhart*, 78 Fed.Appx. 820, 824-25 (3d Cir. 2003) (affirming rejection of treating physician opinion which adopted subjective reports of claimant).

If a non-examining opinion is better supported, more consistent with evidence, or authored by a specialist, then it may be entitled to greater weight than examining or treating opinions.   *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) (Non-examining consultants are "highly qualified…medical specialists who are also experts in Social Security disability evaluation."); *Johnson v. Barnhart*, 89 F. App'x 364, 368 (3d Cir. 2004). An ALJ may reject an examining physician's opinion in favor of a non-examining

physician opinion on the basis of contradictory evidence. *See* 20 C.F.R. 404.1527(c); *Johnson v. Barnhart*, 89 F. App'x 364, 368 (3d Cir. 2004); Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932-01 at 36936 (ALJ may rely on non-medical evidence which is inconsistent with treating physician's opinion); *Torres v. Barnhart*, 139 F. App'x 411, 414 (3d Cir. 2005) (ALJ permissibly rejected treating opinion "in combination with other evidence of record including Claimant's own testimony"); *Kays v. Colvin*, No. 1:13-CV-02468, 2014 WL 7012758, at *7 (M.D. Pa. Dec. 11, 2014).

Substantial evidence supports the ALJ's allocating greater weight to the non-examining January 2013 opinion of Dr. Bohn over the December 2012 consultative examining opinion of Dr. Anselmi.  In support of his January 2013 opinion, Dr. Bohn reviewed 1) consultative examination reports from the Intermountain Medical Group (Dr. Anselmi); 2) records from Geisinger Wyoming Valley Medical Center; 3) records from Kevin J. Carey; 4) records from Adult Services Unlimited; and 5) records from Dr. Vihalbhai Dhaduk.  (Tr. 88-89).  It was reasonable for the ALJ to rely on Dr. Bohn's medical opinion which discussed why Dr. Anselmi's opinion should not be given great weight and based on the totality of the evidence which demonstrates Plaintiff's improved condition and where Dr. Dhaduk repeatedly opined that she was capable of work.  Substantial evidence supports the ALJ allocating greater weight to the opinion of Dr. Bohn.  *See e.g.*, 20

C.F.R.   §§   404.1527(c),   416.927(c);   20   C.F.R.   §§   404.1527(e)(2)(i),

416.927(e)(2)(i); *Johnson v. Barnhart*, 89 F. App'x 364, 368 (3d Cir. 2004).

Substantial evidence supports the ALJ's allocation of weight in this instance

and supports the ALJ's consideration of Dr. Dhaduk's opinion that Plaintiff was

able to do medium duty work.  Plaintiff's own treating physician and treating

physician assistant repeatedly opined that Plaintiff was capable of work.  (Tr. 291-

301, 449-50).   On September 21, 2011, Mr. Hobbs opined that Plaintiff could

perform light duty work which did not require any lifting or bending.  (Tr. 449-

450).   On December 14, 2011, Dr. Dhaduk opined that Plaintiff was capable of

doing light duty work.  (Tr. 291).  On December 30, 2011, Dr. Dhaduk noted that

Plaintiff had "been released to light duty work."  (Tr. 292, 294).  On January 20,

2012, Dr. Dhaduk noted that Plaintiff was "doing a little better,  had been released

to light duty work and capable of light to medium duty work.  (Tr. 296-97).   On

February 24, 2012, Dr. Dhaduk made identical observations as with the last visit.

*Compare* (Tr. 298) *with* (Tr. 292) *and* (Tr. 296).   Dr. Dhaduk's conclusions and

recommendations remained the same as those made in the previous visit.  (Tr. 296,

297, 299).   On April 9, 2012, Dr. Dhaduk made identical observations as with the

last visit.  *Compare* (Tr. 300) *with* (Tr. 292, 296, 298).   Dr. Dhaduk's conclusions

remained the same as those made in the previous visit.  (Tr. 297, 299, 301).   In

addition to the previously repeated recommendations, Dr. Dhaduk recommended

that Plaintiff increase the Lyrica dosage to 75 mg and that Plaintiff could do medium duty work. (Tr. 301). In a letter to Plaintiff's attorney dated February 29, 2012, Dr. Dhaduk stated that Plaintiff had been released to light-medium duty. (Tr. 545).[12] On April 25, 2012, Plaintiff received a bilateral L5 and S1 facet joint nerve block. (Tr. 302). Dr. Dhaduk made identical observations as with the last visit. *Compare* (Tr. 302) *with* (Tr. 292, 296, 298, 300).

Although Plaintiff argued that an increase in pain treatment negates the import of Dr. Dhaduk's opinion that Plaintiff was capable of doing medium work, such is not supported from the record. For example, while Dr. Dhaduk recommended that Plaintiff increase the Lyrica dosage to 75 mg, Dr. Dhaduk still opined that Plaintiff could do medium duty work. (Tr. 301). Moreover, for the examination of the day of Plaintiff's nerve block, Dr. Dhaduk's observations were substantively the same as the ones previously made when he opined that Plaintiff was capable of medium work. *Compare* (Tr. 302) *with* (Tr. 292, 296, 298, 300).

It was reasonable for the ALJ to infer that Dr. Dhaduk's opinions contradicted a finding of disabling limitations that precluded work given: 1) Dr. Dhaduk's opinions that Plaintiff was capable of light duty work followed by being capable of medium duty work; 2) physical therapy notes that Plaintiff was improving, and; 3) that Plaintiff's treating provider opined that Plaintiff was

---

[12] Moreover, if there was any perceived ambiguity for Dr. Dhaduk's assessment that Plaintiff was capable of medium duty work, Plaintiff was in the best position to seek clarification.

capable of work.   Even if it were error for the ALJ to consider Dr. Dhaduk's opinion that Plaintiff was capable of medium duty work without a precise enumeration of what Plaintiff's capabilities and limitations were, such would be harmless error.   *See Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Plaintiff fails to meet her burden in demonstrating how the ALJ's conclusion that Plaintiff was capable of sedentary work would be reversed had the "medium work" opinions been omitted.   *See Thomason Woodson, Appellant v. Commissioner Social Security*, No. 16-1190, 2016 WL 5403634, at *2-3 (3d Cir. Sept. 28, 2016) (citing *Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *see also Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) ("[A] remand is not required here because it would not affect the outcome of the case").

Based on the foregoing, the Court concludes that substantial evidence supports the ALJ's consideration of Dr. Dhaduk's opinion that Plaintiff was capable of "medium" duty work and the allocation of weight to the medical opinions.

## V.     Recommendation

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the

findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections

which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: November 7, 2016                    s/Gerald B. Cohn
                                        _____

                                        GERALD B. COHN

                                        UNITED STATES MAGISTRATE JUDGE